IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,   :
                         :
v.                        :       CRIMINAL INDICTMENT NO.:
                         :       2:13-CR-045-RWS-JCF
STANLEY KOWALEWSKI     :

## <u>ORDER and NON-FINAL REPORT AND RECOMMENDATION</u>

This case is before the Court on Defendant's Motion to Produce Grand Jury Transcripts (Doc. 29); Defendant's Motion to Suppress Evidence Obtained in Violation of Defendant's Attorney-Client and Work Product Privileges (Doc. 30); Defendant's Motion to Suppress Statements (Doc. 31); the Government's Motion for Determination of Applicability of Attorney-Client Privilege to Advice Allegedly Rendered By Martha Peddrick (Doc. 32); and Defendant's Motion to Disclose All Communications Between the U.S. Attorney's Office and the U.S. Securities and Exchange Commission ("SEC") (Doc. 34).

## <u>Factual And Procedural Background</u>

### I.   <u>The SEC's Investigation And Civil Action</u>

In 2009, Defendant Kowalewski[1] formed SJK Investment Management ("SJK"), and at all times relevant to this case, Defendant was the sole owner and

---

[1] Mr. Kowalewski will be referred to as "Defendant" or "Kowalewski" herein. To the extent it is necessary to refer to recently-added Defendant Elizabeth Wood, she will be referred to as "Defendant Wood."

Chief Executive Officer of SJK, an investment adviser registered with the Security and Exchange Commission ("SEC") and headquartered in Greensboro, N.C. (Doc. 1 at ¶ 2; Doc. 34 at 2). On or about March 30, 2010, the SEC initiated a proceeding, *In the Matter of SJK Investment Management, LLC*, No. A-3234, "to determine whether there had been violations of the federal securities laws in connection with SJK." (Doc. 1 at ¶ 10; *see also* Doc. 32-1 at 3). During that investigation, Kowalewski testified under oath on November 29, 2010. (*See* Doc. 1 at ¶ 11; *see also* Doc. 32-1).[2] The Government contends that Kowalewski "testified falsely about a number of topics in his November 2010 sworn testimony before the SEC," in particular about "information and advice from various appraisers, accountants, and attorneys he identified." (Doc. 32 at 4). That testimony, and the Government's contentions, form the basis of some of the charges in the indictment, and are at issue in several of the pending motions.

On January 6, 2011, the SEC filed a Complaint for Emergency Injunctive and Other Relief against Kowalewski and SJK in the Northern District of Georgia. (*See* Doc. 1 in 1:11-CV-56-TCB). In that Complaint, the SEC alleged six counts of fraud against the defendants, for violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. (*See* Doc. 1 in 1:11-CV-56 at ¶¶ 7, 61-83). In general, the SEC alleged that the

---

[2] The Government has provided a copy of the transcript of that testimony. (*See* Doc. 32-1). References to the transcript will be designated at "Tr. __."

defendants defrauded investors by creating the "Special Opportunities Fund," secretly diverting investors' money into that fund from other funds, and then secretly diverting money to themselves "through various self-dealing transactions" by having the Special Opportunities Fund:

> (a) buy Kowalewski's personal home for $2.8 million, almost $1 million more than its 2006 purchase price, (b) purchase a vacation home for Kowalewski for $3.9 million, (c) pay approximately $1 million of Kowalewski and SJK's personal and business expenses, and (d) pay SJK an unfounded $4 million "administration" fee, which Kowalewski then paid himself as a "salary draw."

(*See* Doc. 1 in 1:11-CV-56-TCB at ¶¶ 1-5). The SEC further alleged Defendant and SJK "sent fraudulent monthly account statements to the Investors and/or their representative(s) showing substantial, positive, but illusory, investment returns generated by the 'investments' in the Special Opportunities Fund." (*Id.* at ¶ 6).

During that proceeding, on February 2, 2011, District Judge Timothy C. Batten, Sr., appointed a receiver, S. Gregory Hays, in order to "administer and manage the Receiver Estate," defined as Kowalewski, SJK, and their assets. (*See* Doc. 37 in 1:11-CV-56).[3] On September 30, 2011, Judge Batten entered final judgment, finding Kowalewski liable for disgorgement of $8,420,923.45 plus

---

[3] Judge Batten amended that Order on March 8, 2011 to add Mr. Hays as receiver for SJK Special Opportunities Fund, LP. (*See* Doc. 59 in 1:11-CV-56).

prejudgment interest, and ordering Kowalewski to pay civil penalties in the amount of $16,841,846.90.  (*See id.* at Doc. 140).  He vacated that judgment on August 28, 2012 and entered an amended final judgment in which he found Kowalewski liable for disgorgement of $8,420,923.45 plus prejudgment interest, and ordered him to pay an additional amount of $8,420,923.45 in civil penalties.  (*Id.* at Doc. 184). The Court administratively closed that case on April 18, 2013.  (*Id.* at Doc. 192).

## II.    Criminal Proceedings

### A.    Aborted Plea Proceedings

On the same day that case was closed, April 18, 2013, the Government filed an Information which charged Defendant's co-conspirator, SJK's Chief Financial Officer Michael Fulcher, with conspiring with Defendant to obstruct an SEC proceeding in violation of 18 U.S.C. § 1505, by "draft[ing] two leases, backdated July 1, 2010, to show that the Special Opportunities Fund leased homes to S.K.'s parents and brother-in-law, when in truth there were no such lease agreements at the time of the homes' sales," and he pleaded guilty to that charge the following day.  (*See* Docs. 1, 9 in 1:13-CR-00135-WBH).  Defendant also agreed to plead guilty to an Information charging him with defrauding investors (*see* Doc. 31 at 1; Doc. 36 at 3)[4], and he and his attorney signed a Guilty Plea and Plea Agreement in April 2013.  (*See* Docs. 36-1 & 36-2).  Defendant then decided not to plead guilty,

---

[4] That Information was not filed.

4

and his attorney who negotiated the plea agreement, Nicholas A. Lotito, informed the Court and the Government on September 5, 2013 that he would not be going forward with the scheduled plea. (*See* Doc. 31 at 2; Doc. 36 at 6).

### B.     The Indictment And Superseding Indictment

On November 19, 2013, a Grand Jury in the Northern District of Georgia returned an Indictment which alleges that Defendant defrauded his investors and obstructed the SEC investigation. (*See* Doc. 1). The Government filed a Superseding Indictment on August 12, 2014 (Doc. 63), charging Kowalewski and co-defendant Elizabeth P. Wood (Director of Client Services for SJK) with defrauding investors and also charging Kowalewski with conspiracy and obstruction. Similar to the SEC's allegations in the civil action, the Superseding Indictment alleges that Kowalewski formed the Special Opportunities Fund, which he did not disclose to investors, and then diverted more than $16 million from a disclosed investor fund "to the Special Opportunities Fund without disclosing the transfers to investors." (*Id.* at ¶ 5). The Superseding Indictment further alleges that Kowalewski then:

> diverted millions from that Fund to himself and his personal interests, with defendant Wood's knowledge, through various self-dealing transactions, including having the Special Opportunities Fund purchase three homes from [Defendant] in which his family, his parents, and his brother-in-law's family lived, respectively. [He] also caused the Special Opportunities Fund to buy a multi-million-dollar beach house in Pawley's Island, South Carolina, and pay him $4 million as a fee to which he was not entitled.

(*Id.* at ¶ 6).  In addition, according to the Superseding Indictment:

> As part of the scheme, [Kowalewski], aided and abetted by defendant
> Wood, overvalued the assets held by the Special Opportunities Fund.
> Defendant [Wood] then sent the fraudulent valuations to the
> administrator to use in calculating the returns for investors in the
> Absolute Return Fund.  As a result, the monthly statements that
> [Defendants] caused to be sent to these investors showed fraudulently
> inflated returns.  Investors lost over $8 million as a result of the
> defendants' fraudulent scheme.

(*Id.* at ¶ 7).

The Superseding Indictment charges Defendants with 22 counts of wire fraud relating to wire communications transmitted in interstate commerce "for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud," in violation of 18 U.S.C. §§ 1343 and 2.  (*See generally* Doc. 63).  Count 23 of the Superseding Indictment charges Defendant Kowalewski with conspiring with SJK CFO Michael J. Fulcher to obstruct an SEC proceeding in violation of 18 U.S.C. § 1505, i.e., the SEC's investigation *In the Matter of SJK Investment Management, LLC*, No. 1-3234.  (Doc. 63 at ¶¶ 10-11).  In support of the conspiracy count, the Government alleges that Kowalewski and Fulcher conspired to obstruct the SEC proceeding by creating leases in November 2010 showing that the Special Opportunities Fund had leased three properties to Kowalewski and his relatives, and then backdated the leases "in an effort to document the claimed lease relationships and to conceal the self-dealing transactions by defendant," and that

Kowalewski "provided the fraudulent leases to the SEC as part of the investigation and then testified falsely about them [during his November 29, 2010 testimony] to conceal his actions and obstruct the SEC's investigation." (*Id.* at ¶¶ 12-15). Finally, Count 24 charges Kowalewski with obstructing the SEC investigation from November 3, 2010 until November 29, 2010, "by providing and causing to be provided false and misleading information to the SEC relating to the Special Opportunities Fund," in violation of 18 U.S.C. §§ 1505 and 2, by:

- testifying falsely "that he had discussed the Special Opportunities Fund with D.E. of Fieldale Farms Corporation in the first half of 2010";

- testifying falsely "that he had discussed the Special Opportunities Fund, by phone and face-to-face, with G.S. of St. Joseph's/Candler Health System sometime in the earlier part of 2010 and in the summertime of 2010," and "that he disclosed to G.S. that the Special Opportunities Fund was paying defendant['s] expenses and that the Fund had bought defendant['s] home";

- testifying falsely "that attorney M.T. [Michael Tannenbaum] made changes to the Special Opportunities Fund's Confidential Private Offering Memorandum, dated August 13, 2010, to permit the Fund to pay all of SJK's expenses, with no limits," and "that M.T. had advised that the cap on expenses, including defendant['s] pay should be removed";

- testifying falsely "that, in connection with the Special Opportunities Fund's purchase of his home, appraiser B.C. had informed defendant . . . that his home would easily value for $3.3 million";

- testifying falsely "that after the Special Opportunities Fund had purchased his three homes, the Fund had leased the properties to him and his relatives, each for a yearly rental payment," and "that Fulcher had drafted, and defendant . . . had signed, the leases at or near the time of the homes' sales";

- providing "three backdated leases to the SEC that were fraudulent and misleading"; and

- providing "the SEC a Confidential Private Offering Memorandum for the Special Opportunities Fund, dated August 13, 2010, to support his false claim that an attorney was responsible for the Fund's payment of his expenses without limitation."

(*Id.* at ¶¶ 17-21).

### C. Pending Motions

While the original Indictment was pending, Kowalewski filed the following motions: Motion To Produce Grand Jury Transcripts (Doc. 29); Motion To Suppress Evidence Obtained In Violation Of Defendant's Attorney-Client And Work Product Privileges (Doc. 30); Motion To Suppress Statements (Doc. 31); and Motion To Disclose All Communications Between The U.S. Attorney's Office

And The SEC (Doc. 34).  The Government also filed a Motion For Determination Of Applicability Of Attorney-Client Privilege To Advice Allegedly Rendered By Martha Peddrick.  (Doc. 32).  At Defendant's August 22, 2014 arraignment on the Superseding Indictment, the Court directed Kowalewski to file any additional motions within 14 days.  The only motion Kowalewski then filed was a motion to file an out-of-time reply to one of the pending motions, which the Court granted. Briefing is complete on all motions, and the undersigned now turns to the merits.

## Discussion

## I.      Defendant's Motion To Suppress Statements (Doc. 31)

Kowalewski seeks to suppress evidence of the April 2013 plea agreement and statements he made in connection with that agreement.  (Doc. 31).  His motion finds support in Federal Rule of Evidence 410, which provides in relevant part:

> In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions: (1) a guilty plea that was later withdrawn; a nolo contendere plea; (3) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or (4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

FED. R. EVID. 410(a); *see also* Fed. R. Crim. P. 11(f) ("The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410."); *United States v. Artis*, 261 Fed. Appx. 176,

178 (11th Cir. 2008) (unpublished decision) (" '[A]ny statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty' is not admissible as evidence in a criminal trial." (citing FED. R. EVID. 410)).

The Government argues, however, that Kowalewski's motion should be denied because he "agreed that the plea agreement, including its admission-of-guilt provision, could be introduced at trial against him and expressly waived any objection to its admissibility under Federal Rule of Evidence 410 or any other rule." (Doc. 36 at 1). The Supreme Court has held "that absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995); *see also Artis*, 261 Fed. Appx. at 178 ("[A] defendant may waive the rights he is accorded pursuant to Federal Rule of Evidence 410." (citing *Mezzanatto*)). *Mezzanatto* approved of using of plea statements to impeach a defendant where the defendant had waived the exclusionary provisions of Rule 410, and other courts have now extended *Mezzanatto's* holding to the government's use of plea statements in its case-in-chief where the defendant has waived his objection to their admissibility under Rule 410. *See, e.g.*, *United States v. Mitchell*, 633 F.3d 997, 1004 (10th Cir. 2011) (finding "no analytical distinction between Rule 410's application to

impeachment waivers and case-in-chief waivers"); *United States v. Sylvester*, 583 F.3d 285, 289 (5th Cir. 2009); *United States v. Young*, 223 F.3d 905, 910-11 (8th Cir. 2000); *United States v. Burch*, 156 F.3d 1315, 1321-22 (D.C. Cir. 1998).[5]

In this case, Kowalewski signed two copies of a Guilty Plea and Plea Agreement (*see* Docs. 36-1 and 36-2), the first signed by both Kowalewski and his then-attorney Nicholas A. Lotito (*see* Doc. 36-1), and the second copy signed again by Kowalewski and notarized on April 30, 2013 (*see* Doc. 36-2). The Plea Agreement provides in relevant part:

> The Defendant agrees that this plea agreement could be introduced and would be admissible against him in any trial in this case. The Defendant specifically agrees to waive any objection to the use of this plea agreement pursuant to Federal Rule of Evidence 410 or any other basis. The Defendant admits that he is guilty of using the Special Opportunities Fund in furtherance of a scheme to defraud investors, as alleged in the Information.[6]

---

[5] The parties did not cite to Eleventh Circuit authority on this point, and it appears that the Eleventh Circuit has not addressed whether *Mezzanatto*'s holding should be extended to the use of plea statements in the government's case-in-chief. The undersigned finds the reasoning of the other circuits in the cases cited above to be persuasive, i.e., that there is no analytical distinction between the use of plea statements to impeach the defendant or in its case-in-chief where the defendant has waived the exclusionary provisions of Rule 410.

[6] The Government asserts that the written admission of guilt in the plea agreement "was an important part of the government's dealings with the defendant" because his attorney had requested that the plea hearing be delayed to give Defendant more time to raise money for restitution, so the Government agreed to that request but conditioned on Defendant's written admission of guilt, "thereby minimizing the government's concerns associated with the delay." (Doc. 36 at 5). The Government asserts that it agreed to further delays to give Defendant more time to raise money to make restitution to his victims, but on September 5, 2013, the day before the rescheduled plea hearing, "Lotito informed the Court and the

(*See* Docs. 36-1 at 13 and 36-2 at 13). Thus, the plea agreement contains a waiver of Rule 410's bar to the admissibility of the plea agreement or any statements therein. Moreover, the agreement shows that Kowalewski entered into the plea agreement knowingly and voluntarily. The agreement states that Kowalewski read the plea agreement and "carefully reviewed every part of it with [his] attorney," that he "under[stood] the terms and conditions contained in the Plea Agreement," and that he "voluntarily agree[d] to them." (Doc. 36-1 at 14). The agreement also provides:

> No one has threatened or forced me to plead guilty, and no promises or inducements have been made to me other than those discussed in the Plea Agreement. The discussions between my attorney and the Government toward reaching a negotiated plea in this case took place with my permission. I am fully satisfied with the representation provided to me by my attorney in this case.

(*Id.* at 15). Kowalewski has not provided any basis for questioning those representations or shown that he did not knowingly and voluntarily agree to the provisions in the plea agreement, including the Rule 410 waiver. To the contrary, his prior contention that the plea statements were made unknowingly, involuntarily, or without benefit of effective counsel has been withdrawn. (*See* Doc. 60). Thus, it appears that Kowalewski executed a waiver of the exclusionary provisions of Rule 410 and agreed that the plea agreement, and the statements

government that Kowalewski would not be going forward with the scheduled plea." (*Id.* at 5-6).

made therein, could be introduced against him at "any trial in this case," and that his waiver was knowing and voluntary. Yet the parties disagree over when the waiver was to become enforceable.

Kowalewski contends that the waiver is not enforceable because "the Plea Agreement was not accepted by any court" and thus "was not actually entered into," and he "did not have the benefit of a plea colloquy at which the court would explain the rights he was giving up by entering into the Guilty Plea and Plea Agreement."[7] (Doc. 31 at 3). The Government counters that the court can enforce the Rule 410 waiver "even when, as here, the agreement was never accepted by a court." (Doc. 36 at 7).

Under these circumstances timing is everything, for resolution of this issue turns on whether the provisions of the plea agreement become effective and enforceable when the agreement is executed or only after a court approves the agreement. A plea agreement is "in essence, a contract between the Government

_____

[7] On reply, Kowalewski also contends that: (1) "the reference to use of the plea agreement 'in any trial' indicates that there may have not been a meeting of the minds to resolve the case by plea"; (2) "the provision is limited to 'this case' which should mean the Information to plead guilty to 18 U.S.C. § 2314 before Judge Hunt, not this current case"; (3) "the provision is worded in such a way that the plea agreement could be used against [him] even if the government decided to renege on the agreement or the Court declined to accept the agreement"; and (4) "there is no evidence that the government ever signed the plea agreement." (Doc. 46 at 2 n.1). Because the undersigned finds that the plea agreement is ambiguous as to Kowalewski's Rule 410 waiver, it is unnecessary to address his additional contentions.

and a criminal defendant." *United States v. Jones*, 544 Fed. Appx. 862, 864 (11th Cir. 2013) (unpublished decision); *see also United States v. Ramos*, 433 Fed. Appx. 893, 896 (11th Cir. 2011) (unpublished decision) ("Plea bargains are like contracts and should be interpreted in accord with what the parties intended." (quotations omitted)). Yet, consistent with Rule 11 of the Federal Rules of Criminal Procedure, a plea agreement does "not become effective and binding until approved by order of the court." *See Harbert*, 206 Fed. Appx. 903, 909 (11th Cir. 2006); *see also, United States v. Novosel*, 481 F.3d 1288, 1291-92 (10th Cir. 2007) ("Although the interpretation of a plea agreement may be informed by contract law, the formation and acceptance of a binding plea agreement is governed by Federal Rule of Criminal Procedure 11."). In *United States v. Wood*, 378 F.3d 342 (4th Cir. 2004), the court elaborated on the tension governing interpretations of plea agreements:

> The law governing the interpretation of plea agreements is an amalgam of constitutional, supervisory, and private contract law concerns . . . . In most cases, contract principles will be wholly dispositive because neither side should be able, any more than would be private contracting parties, unilaterally to renege or seek modification simply because of uninduced mistake or change of mind . . . . A plea agreement, however, is not simply a contract between two parties. It necessarily implicates the integrity of the criminal justice system and requires the courts to exercise judicial authority in considering the plea agreement and in accepting or rejecting the plea . . . . . Consequently, we hold the Government to a greater degree of responsibility than the defendant (or possibly than would be either of the parties to commercial contracts) for imprecisions or ambiguities in plea agreements.

*Id.* at 348 (internal quotations omitted); *see also Ramos*, 433 Fed. Appx. at 896 ("Any ambiguities in the agreement should be resolved in favor of the defendant."); *United States v. Jefferies*, 908 F.2d 1520, 1523 (11th Cir. 1990) ("[A] plea agreement that is ambiguous must be read against the government."); *United States v. Newbert*, 504 F.3d 180, 185 (1st Cir. 2007) ("Ambiguities in plea agreements are construed against the government." (citing *United States v. Giorgi*, 840 F.2d 1022, 1026 (1st Cir. 1988) ("[W]e hold that the government must shoulder a greater degree of responsibility for lack of clarity in a plea agreement.")). "Because a plea agreement implicates defendant's fundamental and constitutional rights, the Court acknowledges that its analysis of the plea agreement or a breach thereof should be 'conducted with greater scrutiny than in a commercial contract.' " *United States v. Alazzam*, No. 1:08cr101(JCC), 2009 U.S. Dist. LEXIS 92220, at *7 (E.D. Va. Sept. 29, 2009) (quoting *United States v. McQueen*, 108 F.3d 64, 66 (4th Cir. 1997)).

Without question, plea agreements are "effective and binding" upon acceptance by the court, but here the court must determine whether a provision of the plea agreement -- namely the Rule 410 waiver -- became "effective and binding" even without the court's approval of the plea agreement. That inquiry centers on whether the agreement reflects that Kowalewski unambiguously showed his intent to waive his Rule 410 rights "contemporaneously with his signing of the

plea agreement, or, instead, intended to waive them only upon the district court's acceptance and activation of his guilty plea." *United States v. Escobedo*, 757 F.3d 229, 233 (5th Cir. 2014). As discussed below courts have upheld provisions such as the Rule 410 waiver at issue here, even without the court's final stamp of approval, where the agreement unambiguously indicated that court approval was not required or provided some external "triggering" event for the application of the waiver, such as a breach of the agreement.

Citing one such case, *United States v. Washburn*, 728 F.3d 775 (8th Cir. 2013), the Government contends Kowalewski's Rule 410 waiver became binding against him the moment he signed the plea agreement, and that it did not require the court's review or approval to enforce that provision against Defendant. (*See* Doc. 36 at 7, 9-10). Kowalewski counters that since his aborted plea agreement was "subject to approval by the Court," "approval by the Court is a condition precedent to the agreement binding the parties," and because the Court never approved the agreement, Defendant argues, "the Agreement was not actually entered into." (*See* Doc. 31 at 3; Doc. 46 at 2)

Resolving this conflict invites a closer look at several cases. In *Washburn*, the district court admitted a stipulation contained in a plea agreement in the government's case, even though the defendant had decided not to plead guilty and the court never accepted the plea agreement at a plea hearing. *Id.* at 779. The

Eighth Circuit rejected the defendant's assertions that he had not voluntarily and knowingly waived his rights under Rule 410 and that the district court had erred in admitting the agreement. *Id.* at 780. The court found that it was irrelevant that "the agreement was never approved and accepted by the court" and that no plea was entered. *Id.* at 780-81. Instead, the court found that, consistent with ordinary contract principles, "[t]he plea agreement was binding at the time Washburn added his initials and signature." *Id.* at 781. Furthermore, the court found no evidence that the defendant "entered into the agreement involuntarily or unknowingly;" he signed the agreement and did not contend that the agreement was the product of coercion or duress. *Id.* The court also rejected the defendant's argument that the trial court was required to conduct an inquiry into the voluntariness of his waiver before admitting the stipulation because "a dialogue between the district court and the defendant regarding the knowing and voluntary nature of a plea agreement that usually occurs at a change of plea hearing is not a prerequisite for a valid waiver of a particular right." *Id.* at 781-82 (internal quotation omitted). The court relied on the language of the agreement itself, which provided that the defendant "understood the provisions therein" and advised him that the plea statement could be used against him in any proceeding, to find that the "plea statement waiver was knowing and voluntary," and thus the district court did not err in admitting the stipulation. 728 F.3d at 782.

The agreement in *Washburn*, however, differs from the one here because the plea agreement in that case stated that the defendant waived his rights under Rules 410 and 11(f) "and agrees this stipulation may be used against defendant at any time in any proceeding should defendant violate or refuse to follow through on this plea agreement, *regardless of whether the plea agreement has been accepted by the Court*."  728 F.3d at 780 (emphasis added); *see also United States v. Cortez*, No. 12-CR-74-LRR, 2012 U.S. Dist. LEXIS 173799, at *1-2, 4-5 (N.D. Iowa Dec. 7, 2012) (finding plea statements admissible where defendant agreed to waive Rule 410 and that his plea statement may be used against him "regardless of whether the plea agreement has been accepted by the [c]ourt," and then he changed his mind about pleading guilty before court accepted plea); *United States v. Mayer*, 748 F. Supp. 2d 1022  (N.D. Iowa 2010) (same).

Other courts have enforced Rule 410 waivers where the agreements clearly stated that the Rule 410 waiver would be enforceable if the defendant breached the agreement by failing to plead guilty or by withdrawing the plea.  *See, e.g.*, *Washburn*, 728 F.3d at 780 ("Defendant waives these rights and agrees this stipulation may be used against defendant at any time in any proceeding should defendant violate or refuse to follow through on this plea agreement."); *United States v. Nelson*, 732 F.3d 504, 513, 516-17 (5th Cir. 2013) (agreement "contained a waiver clause providing that if Nelson failed to plead guilty, 'any information

provided by the defendant,' including 'but not limited to[] the factual stipulation contained in this Plea Agreement,' 'may be used against [Nelson] in this or any other prosecution.' "); *United States v. Stevens*, 455 Fed. Appx. 343, 344 (4th Cir. 2011) (defendant "agreed that if he withdrew from the plea agreement or proceeded to trial on the conspiracy charge, the Government was permitted to use the stipulation of facts as evidence in its case-in-chief."); *Mitchell*, 633 F.3d at 999-1006 (plea agreement stated, "if I withdraw my plea of guilty, I shall assert no claim under . . . Rule 410 . . . or any other federal rule."); *United States v. Young*, 223 F.3d 905, 908-11 (8th Cir. 2000) (plea agreement specified the consequences of breaching the agreement); *Cortez*, 2012 U.S. Dist. LEXIS 173799, at *4 (defendant agreed to waive Rule 410 and that his plea statements could be admitted "should [D]efendant violate or refuse to follow through on this plea agreement."); *Mayer*, 748 F. Supp. 2d at 1028-29 ("Mayer's plea agreement not only identified use of the stipulated facts therein against him as one of the consequences if he breached the agreement . . ., it contained an express waiver of his rights under Rule 410 . . . in the event of a breach."); *Alazzam*, 2009 U.S. Dist. LEXIS 92220, at *2-3, 6-10 (plea agreement stated in relevant part, "If the defendant withdraws from this agreement . . . or otherwise violates any provision of this agreement, then . . . [t]he defendant waives any right to claim that [any statements] should be excluded or suppressed under Fed. R. Evid. 410 [or other rules, sentencing guidelines or

constitutional provisions].”); *see also United States v. Sylvester*, 583 F.3d 285, 287-94 (5th Cir. 2009) (approving admission of statements made during failed plea negotiations where the defendant had waived his objections to their admission at trial in the event that plea negotiations failed and the case proceeded to trial). Thus, the agreements in those cases showed that the Rule 410 waivers were essentially self-executing upon a breach and did not require court approval of plea agreement to take effect.

The plea agreement here states, “The Defendant, his counsel, and the Government, *subject to approval by the Court*, have agreed upon a negotiated plea in this case, the terms of which are as follows[.]” (*See* Doc. 36-2 at 3 (emphasis added)). The Rule 410 waiver, which is part of that plea agreement,[8] does not indicate that Defendant waived his Rule 410 rights and agreed that his plea statements could be admitted against him regardless of whether the court approved the agreement, as in *Washburn*, 728 F.3d at 780. (*See* Doc. 36-2 at 13). The language “subject to the approval of the Court” indicates otherwise, particularly in the absence of language similar to that in the agreement in *Washburn*. Nor was the Rule 410 waiver deemed effective if Kowalewski breached the agreement by failing to plead guilty or by withdrawing his guilty plea, as in the agreements in the

---

[8] The “Plea Agreement” is set out in part IV of the “Guilty Plea and Plea Agreement,” and the Rule 410 waiver is set out in a subsection of part IV called “Miscellaneous Waivers.” (*See* Doc. 36-2 at 3, 13).

cases cited above, which further supports an interpretation that the waiver was conditioned on the plea agreement being approved by the court. Thus, the undersigned thus finds that the agreement "is ambiguous as to whether [Defendant] intended to waive his Rule 410(a) . . . rights contemporaneously with his signing of the plea agreement, or, instead, intended to waive them only upon the district court's acceptance and activation of his guilty plea." *Escobedo*, 757 F.3d at 233.

Even language much more detailed and favorable to the Governments' position has been found to be ambiguous with regards to when a waiver becomes effective. In *Escobedo*, the plea agreement stated in relevant part:

> If defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and the defendant's plea and sentence will stand. If at any time defendant retains, conceals or disposes of assets in violation of this plea agreement, or if defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then [the government] may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by the defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, can and will be used against defendant in any prosecution. *Additionally, all statements made pursuant to this plea agreement will be admissible against [Escobedo] who hereby waives the provisions of Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence*.

*Id.* (emphasis added). The Fifth Circuit found that the plea agreement did not unambiguously indicate that the defendant intended to waive his Rule 410 and 11(f) rights "contemporaneously with his signing of the plea agreement," or

whether he "intended to waive them only upon the district court's acceptance and activation of his guilty plea":

> Escobedo had an absolute right under Federal Rule of Criminal Procedure 11(d)(1) to withdraw his guilty plea before it was accepted by the district court. Nothing in the plea agreement clearly and unambiguously states that Escobedo waived his right to withdraw his guilty plea prior to acceptance when he entered the plea agreement. Consequently, the plea agreement may reasonably be interpreted so as to not waive Escobedo's Rule 410(a) and 11(f) rights if he prevented his guilty plea from becoming effective by withdrawing it prior to its acceptance by the district court.

*Id.* at 233-34. Because the court found the agreement to be ambiguous, it concluded that the defendant's Rule 410(a) and 11(f) waiver "did not become effective under the circumstances of this case, and that his guilty plea and the factual basis recited in [his] withdrawn plea agreement and [plea] statements . . . were inadmissible at [his] trial." *Id.* at 234. The court found that "[t]he district court erred by allowing the prosecutor to present those statements to the jury" and reversed the defendant's conviction. *Id.*

The court in *Escobedo* also noted that the waiver language was included in a section called "Breach of Agreement," which "suggests that it would become effective only if Escobedo breached the agreement," but "the section does not clearly or unambiguously state what constitutes a breach of the agreement." 757 F. 3d at 234; *see also United States v. Newbert*, 504 F.3d 180 (1st Cir. 2007).

Another case from the First Circuit illustrates that a Rule 410 waiver must be unambiguous or clearly linked to a defined breach to be enforceable. In *Newbert*, the defendant signed a plea agreement and pleaded guilty, but then the district court allowed him withdraw his guilty plea. *Id.* at 183. The government argued that the defendant waived his Rule 410 rights by withdrawing his plea, but the district court disagreed and barred the government from using evidence related to his plea agreement. *Id.* The First Circuit affirmed, finding the Rule 410 language to be "clearly ambiguous" because the waiver provided that a court-approved plea withdrawal could trigger the Rule 410 waiver "under circumstances constituting a breach," but "contain[ed] no definitions for when the withdrawal of a plea allowed by a court could constitute a breach." *Id.* at 185. The court rejected the government's efforts to read definitions into the meaning of the word "breach" that were not in the agreement:

> If the government had such a clear idea of what the breach language did or did not cover, it could have said as much in the agreement itself. Instead, not only does the government fail to acknowledge that it must bear the cost of ambiguities in the plea agreement, it also firmly and incorrectly argues that the ambiguous language should be construed *against* the defendant.

*Id.* at 183, 185-86.

In this case, the waiver provision itself does not define breach or set out what actions or failures trigger the Rule 410 waiver and allow for admission of the plea statements. The Government asserts in its brief that Defendant "waive[d] any

objection to [the] admissibility [of his written admission of guilt in the plea agreement] at trial *in the event he failed to follow through with the plea*." (Doc. 36 at 5). While that statement may accurately reflect the Government's understanding of how the agreement was supposed to work, the agreement itself does not include such limiting language. To the contrary, the agreement flatly states that it is subject to the court's approval and contains no provision deeming the 410 waiver effective if Kowalewski failed to go through with his plea.

The parties plainly were capable of agreeing to make the waiver enforceable even without court approval if Kowalewski did not go forward with his plea. Elsewhere in the agreement, the parties set out clear consequences for breaching certain provisions. For example, the agreement states that "if, after entering this Plea Agreement, the Defendant engages in conduct inconsistent with accepting responsibility," the Government "will not be required to recommend acceptance of responsibility" in sentencing; "if the Government determines that the Defendant has not been completely truthful and candid in his cooperation with the Government, he may be subject to prosecution for perjury, [etc.], and all information Defendant has provided may be used against Defendant in such a prosecution"; and if Defendant fails to cooperate as set forth in the agreement, "Defendant will not be entitled to any consideration whatsoever pursuant to" provisions set out in the agreement. (*See* Doc. 36-2 at 5, 8, 9). Yet Kowalewski's

agreement is silent, however, on what breaches, if any, might trigger the Rule 410 waiver. In *Nelson*, a case similar to this one in that the defendant changed his mind about pleading guilty after signing the plea agreement, the government argued successfully that the defendant's plea statement was admissible because "the plea agreement contained an enforceable waiver provision stating that *even if Nelson decided not to plead guilty*, the factual basis could be used against him in a future prosecution." 732 F.3d at 516 (emphasis added). The waiver in this case does not contain similar language. The parties could have elected to include such language, but did not.

In light of the foregoing, the undersigned finds that the plea agreement at issue is ambiguous as to whether Defendant intended to waive his Rule 410 rights contemporaneously with his signing the plea agreement, whether the waiver was conditioned on the court's approval of the plea agreement, i.e., "subject to the approval of the Court" (Doc. 36-2 at 3), or whether it was conditioned on an unspecified breach of the agreement. Thus, the agreement in this case, and in particular the Rule 410 waiver, differs materially from those identified above where the plea agreements stated unambiguously that the defendant waived his Rule 410 rights regardless of the court's approval of the agreement, or specified

the circumstances triggering the Rule 410 waiver including failing to plead guilty or otherwise withdrawing the guilty plea.[9]

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress evidence of the April 2013 plea agreement and statements he made in that agreement (Doc. 31) be **GRANTED**.

## II.   Defendant's Motion To Suppress Evidence Obtained In Violation of Attorney-Client Privilege (Doc. 30)

Kowalewski moves to suppress any evidence he contends the Government obtained in violation of the attorney-client privilege. "The attorney-client privilege exists to protect confidential communications between client and lawyer made for the purpose of securing legal advice." *United States v. Fulwood*, No. 12-11821, 2014 U.S. App. LEXIS 11124, at *4 (11th Cir. June 16, 2014) (unpublished decision) (quotations omitted). To establish that privilege, Kowalewski must establish:

> (1) the asserted holder of the privilege is or sought to become a client;
> (2) the person to whom the communication was made (a) is (the) member of a bar or a court, or his subordinate and (b) in connection

---

[9] The Government did not cite to any case that enforced a Rule 410 waiver in the circumstances present here, i.e., where the agreement contains a blanket Rule 410 waiver with no indication that it is effective even if the court does not approve the agreement, or in the event of a breach, and the court does not review the plea agreement because the defendant does not proceed with his guilty plea. The Government did cite the *Nelson* case (*see* Doc. 36 at 8-9), but the agreement in that case provided "that *even if Nelson decided not to plead guilty*, the factual basis could be used against him in a future prosecution." 732 F.3d at 516 (emphasis added).

with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Id.* at *4-5 (quotations omitted). "The Defendant bears the burden to establish that a communication was privileged." *Id.* at *4.

Kowalewski asserts that he "is seeking to suppress any testimony at trial by any lawyer that represented him," including the testimony of Michael Tannenbaum and attorneys with his firm Tannenbaum Helpern Syracuse & Hirschtritt LLP ("THSH"), "and the lawyers who have provided statements to the government regarding their prior representation of Mr. Kowalewski." (Doc. 52 at 1). The only specific attorney-client communications identified are those referenced in the Indictment (and Superseding Indictment), i.e., allegations that he testified falsely about actions or advice his attorney Michael Tannenbaum gave him with respect to the Special Opportunities Fund. (*See* Doc. 1 at ¶ 17(c); Doc. 63 at ¶ 18(c)). Kowalewski also appears to seek to suppress documents he has obtained in discovery from the Government that contain communications between him and attorneys who represented him and SJK, specifically "communications between Mr. Kowalewski and attorneys from THSH." (Doc. 52 at 1-2). Kowalewski also requests the Court conduct an *in camera* inspection of these documents. (*Id.* at 2).

27

He asserts that "it is unknown whether AUSAs McClain and Phillips have reviewed" the purportedly privileged communications, and therefore he requests an *in camera* review as well as the designation of a "privilege team" by the U.S. Attorney's office to review the documents "[i]n order to prevent privileged information from being shared with" the Government's attorneys prosecuting this case, i.e., Stephen McClain and Russell Phillips. (*Id.* at 2 n.1). Finally, Kowalewski contends that the Court should conduct a hearing on his motion because "the Court does not have all of the facts necessary to decide the motion, including:

- Why Mr. Kowalewski believed he had an attorney-client relationship with these lawyers separate from their relationship with SJK.
- Information about whether the US Attorney's Office influenced the receiver's decision to waive SJK's privilege
- Information on THSH's [Tannenbaum Helpern Syracuse & Hirschtritt LLP] representation of Mr. Kowalewski and how its counsel determined its waiver of SJK's privilege did not affect Mr. Kowalewski's privilege.
- Information on how other lawyers who represented Mr. Kowalewski determined that they were not waiving his privilege by providing statements to the U.S. Attorney's Office

(*Id.* at 3-4).

The Government contends that suppression of evidence about those communications is not warranted for three reasons: (1) the communications were made while Kowalewski was acting as an officer of SJK, not in his personal capacity, and Gregory Hays, the receiver appointed by Judge Batten in the SEC's

civil action, was authorized to and did waive SJK's attorney-client privilege; (2) Kowalewski waived the privilege by testifying to the communications at issue on November 29, 2010; and (3) the crime-fraud exception to attorney-client privilege applies[10]. (*See* Doc. 38 at 2-4; Doc. 54 at 1-9). Further, the Government asserts that there is no basis for holding a hearing or conducting an *in camera* review. (*See* Doc. 38 at 6; Doc. 54 at 9-10).

## A.    The Receiver's Waiver Of Privilege

First, the Government points out that in the civil action brought by the SEC, Judge Batten appointed a receiver who had the power to waive the attorney-client privilege of SJK, and who did just that. (Doc. 38 at 2-3; *see also* Doc. 37 in 1:11-CV-56). Thus, the Government contends that Kowalewski "has no standing to assert the privilege now," quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985) ("Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties."). (Doc. 38 at 3).

Kowalewski does not dispute that the receiver had the power to waive the attorney-client privilege as to SJK, but asserts that "the receiver did not have the

---

[10] The crime-fraud exception provides that certain attorney-client communications are not privileged where they were "made in furtherance of a crime or fraud." *In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987).

power to waive [Defendant's] individual attorney-client privilege." (Doc. 52 at 2). Kowalewski contends that "to the extent both [Defendant] and SJK were represented by the same attorneys on the same issues, it is unclear how the receiver could have waived SJK's privilege and not [Defendant's]." (*Id.*). He also contends that "at this point, it is unknown when the U.S. Attorney's Office began investigating [Defendant] and SJK and what effect, if any, that has on the receiver's decision to waive SJK's attorney-client privilege." (*Id.* at 2-3).

The Government has shown that Mr. Hays, SJK's receiver, waived the attorney-client privilege of SJK, as he was authorized to do (*see* Doc. 37 in 1:11-CV-56), and that Kowalewski, through his counsel Thomas Todd, agreed with the receiver's counsel Thomas Bosch that all communications between Kowalewski and Tannenbaum/THSH prior to January 6, 2011 were as an officer of SJK, not Kowalewski personally, and that the waiver extended to those communications. (*See* Doc. 54 at 1-4; *see also* Doc. 54-1 through 54-3). The Government made that showing through the Declaration of Thomas Bosch, a partner at the firm that represents the receiver, Mr. Hays (Doc. 54-1); a May 16, 2011 letter from an attorney at that firm to Paul Douglas of the U.S. Attorney's Office (Doc. 54-2); and May 2011 e-mails between Bosch and Todd concerning, among other things, the

scope of the receiver's waiver of privilege (Doc. 54-3).[11]  In his Declaration, Bosch testified that "[a]fter his appointment, the Receiver, acting on behalf of SJK, waived the attorney-client privilege held by SJK," and "[t]he Receiver communicated his waiver of SJK's attorney-client privilege to third parties, including the U.S. Attorney's Office" on May 16, 2011. (Bosch Decl., Doc. 54-1 at ¶¶ 3-4 (citing Ex. A to Decl., Doc. 54-2)).  Furthermore, "[i]n May 2011, the Receiver and Mr. Kowalewski, through counsel, agreed on the parameters of the attorney-client privilege held individually by Kowalewski, as opposed to SJK, with respect to the legal representation provided by several law firms, including [TSHS]."  (Bosch Decl. at ¶ 6).  "Specifically, we agreed that the Receiver (1) could assume that communications between Kowalewski and the Tannenbaum firm dated prior to January 6, 2011 related to legal services provided to SJK or one of the funds managed by it and, therefore, that Kowalewski did not hold any personal privilege with respect to those communications, and (2) would assume, subject to certain exceptions, that communications dated on or after January 6, 2011 (the date the SEC filed its civil action against SJK and Kowalewski) between Kowalewski and the Tannenbaum firm related to legal services provided to

_____

[11] The Court gave Kowalewski until Friday, August 1, 2014 to respond to the Government's evidentiary submissions and arguments based on those exhibits. (*See* Doc. 55).  Kowalewski filed no response within the time allowed.  At the August 22, 2014 conference, Kowalewski's counsel indicated a reply brief (along with a motion for leave to file it out of time) may be forthcoming, (*see* Doc. 77), but to date none has been filed.

Kowalewski individually and, therefore, that Kowalewski personally held the attorney-client privilege for those communications." (*Id.* (citing May 2011 e-mail exchange memorializing this agreement attached as Ex. B to Decl., Doc. 55-3)). The undersigned finds that the foregoing establishes that Kowalewski's communications with Tannenbaum or his firm prior to January 6, 2011 were on behalf of SJK, not Kowalewski personally, and that SJK's receiver waived attorney-client privilege as to those communications.

## B.    Defendant's Waiver Of Privilege

In addition, the Government argues that Kowalewski waived any privilege with respect to his communications with Tannenbaum about the Special Opportunities Fund that are at issue in the Indictment by testifying about those communications during his November 29, 2010 testimony during the SEC investigation, and on May 13, 2011, when his attorney, Mr. Todd, "expressly agreed in writing that all communications between Kowalewski and Tannenbaum before January 6, 2011 were not privileged." (Doc. 54 at 5). The undersigned agrees.

"The attorney-client privilege belongs solely to the client, and the client may waive it, either expressly or by implication." *Mohawk Indus. v. Interface, Inc.*, No. 4:07-CV-0212-HLM, 2008 U.S. Dist. LEXIS 104317, at *19 (N.D. Ga. Sept. 29, 2008) (internal quotations omitted); *see also United States v. Lehtinen*, No. 13-

23030-Civ-COOKE/TURNOFF, 2014 U.S. Dist. LEXIS 48058, at *2-3 (S.D. Fla. Jan. 30, 2014) ("It is well settled that, as holder of the attorney-client privilege, the client may explicitly or impliedly waive privilege."). "Implied waiver of the attorney-client privilege can occur where a party voluntarily injects either a factual or legal issue into the case, the truthful resolution of which requires an examination of the confidential communications." *Lehtinen*, 2014 U.S. Dist. LEXIS 48058, at *3 (quotations omitted). The Eleventh Circuit recognizes waiver by implication in three circumstances:

> (1) when a client testified concerning portions of the attorney-client communication; (2) when a client places the attorney-client relationship directly at issue; and (3) when a client asserts reliance on an attorney's advice as an element of a claim or defense.

*Id.* (quoting *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1418 (11th Cir. 1994), modified on other grounds, 30 F.3d 1347 (11th Cir. 1994)); *Adler v. Wallace Computer Servs.*, 202 F.R.D. 666, 674-75 (N.D. Ga. 2001). " 'All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party.' " *Cox*, 17 F.3d at 1418 (quoting *Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444, 447 (S.D. Fla. 1980)). "Once a party waives the attorney-client privilege as to a communication, the waiver generally extends to all

other communications relating to the same subject matter."  *Mohawk*, 2008 U.S. Dist. LEXIS 104317, at *19 (internal quotations omitted).  "Further, once waived, the attorney-client privilege cannot be reasserted."  *Id.* (internal quotations omitted).

In the obstruction charge (Count 24), the Superseding Indictment charges that Kowalewski obstructed the SEC investigation by, among other things, testifying falsely "that attorney M.T. made changes to the Special Opportunities Fund's Confidential Private Offering Memorandum, dated August 13, 2010, to permit the Fund to pay all of SJK's expenses, with no limits," and "that M.T. had advised that the cap on expenses, including defendant['s] pay should be removed," when "[i]n truth, M.T. did not make changes to the Confidential Private Offering Memorandum permitting unlimited payment of expenses and did not advise that the cap on expenses be removed."  (Doc. 63 at ¶ 18(c)).

Kowalewski testified on November 29, 2010 that Tannenbaum revised the initial Private Offering Memorandum for the Special Opportunities Fund to remove a $500,000 cap on reimbursement of expenses so that there would be no limit on expenses. (Tr. 30-31, 35, 68-69).  He further testified that the cap was removed "on the advice of counsel to [be] in line with other funds."  (Tr. 69).  He then specified that that counsel was Tannenbaum.  (Tr. 70).  Because Kowalewski testified about the content of his communications with Tannenbaum, i.e., that

34

Tannenbaum advised him to revise the Offering Memorandum for the Special Opportunities Fund to remove any cap on expenses "to [be] in line with other funds," Kowalewski waived his privilege, to the extent any privilege existed, with respect to his communications with Tannenbaum about the Special Opportunities Fund's expense cap. *See, e.g.*, *United States v. Hardy*, 421 Fed. Appx. 450, 454-55 (5th Cir. 2011) ("Even assuming that Shaffer's testimony was privileged, the district court did not err in admitting it because Hardy waived the privilege by testifying about Shaffer's advice at the Bankruptcy Rule 2004 hearing."); *United States v. Matthies*, 319 Fed. Appx. 554, 558 (9th Cir. 2009) ("To the extent that the information discussed at trial was ever protected by attorney-client privilege, Mr. Matthies waived the privilege by testifying to his former attorneys' advice."); *United States v. Plache*, 913 F.2d 1375, 1378-80 (9th Cir. 1990) (finding that defendant waived privilege by testifying before the grand jury about his attorney's advice); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, No. 13 Civ. 816 (WHP) (GWG), 2014 U.S. Dist. LEXIS 63168, at *11-14 (S.D. N.Y. May 7, 2014) ("[E]ven if defendants had shown that the communications [at issue] were privileged, Smyres waived the privilege by testifying repeatedly and without objection about those conversations" at his deposition.); *Original Rex, LLC v. Beautiful Brands Int'l, LLC*, No. 10-CV-424-GKF-FHM, 2011 U.S. Dist. LEXIS 42528, at *3-4 (N.D. Okla. Apr. 19, 2011) (finding that defendants' representative

waived attorney-client privilege by testifying at his about his communications with defendants' attorney).

Furthermore, even if Kowalewski did not waive his privilege by testifying about his communications with Tannenbaum, he agreed that all pre-January 6, 2011 communications between himself and Tannenbaum or Tannenbaum's firm were not privileged, as evidenced by his attorney's May 13, 2011 e-mail to the receiver's attorney Mr. Bosch.[12] (*See* Doc. 54-3 at 203 (agreeing with proposal by the receiver's attorney that pre-January 6, 2011 communications between Kowalewski and THSH "relate to legal services provided to SJK or one of the SJK funds" and would therefore be marked "not privileged")).

Because any attorney-client privilege protecting Kowalewski's pre-January 2011 communications with Mr. Tannenbaum or his firm concerning the Special Opportunities Fund was waived by SJK's receiver and/or Kowalewski[13], it is

---

[12] In support of Kowalewski's reply brief on his motion to disclose all communications between the U.S. Attorney's Office and the SEC, discussed below, Mr. Todd provided an affidavit concerning his communications with an SEC attorney. (*See* Doc. 81-1). He did not, however, rebut the Government's assertion or evidence that he agreed that all communications between Kowalewski and Tannenbaum before January 6, 2011 were not privileged. (*See id.*).

[13] Kowalewski argues that "[e]ven if the Court were to find a waiver, it does not necessarily follow that all of [his] communications with THSH are no longer protected by the attorney-client privilege or work-product doctrine." (Doc. 52 at 3). In reply, the Government posits that Kowalewski "misunderstands the Government's argument" because the Government "does not contend that the privilege was waived as to all of Kowalewski's communications with Tannenbaum due to [his] SEC testimony on November 29, 2010." (Doc. 54 at 6). "Instead, the

**RECOMMENDED** that Kowalewski's motion to suppress evidence of those communications (Doc. 30) be **DENIED**.[14]

### C.    Defendant's Request For Hearing Or In Camera Review

As the Court found in its July 23, 2014 Order, Kowalewski has not shown that a hearing is necessary for the Court to resolve this motion.  (*See* Doc. 55 at 2). Moreover, in light of the Government's representations concerning the designation of a "privilege team," *in camera* review of other, unspecified, communications purportedly protected by attorney-client privilege is not warranted at this time. Specifically, the Government represents that Assistant U.S. Attorneys McClain and Phillips have not reviewed documents containing communications between Defendant and Tannenbaum, and have agreed to designate a "privilege team" at the U.S. Attorney's Office "to review the documents and determine whether they are, in fact, privileged."  (Doc. 54 at 10).  The Government asserts that "[i]f the

---

Government contends that the privilege was waived by that testimony only with respect to the specific communications that are described in paragraph 17(c) [now 18(c)] of the Indictment."  (*Id.*). Kowalewski has not identified any other communications between himself and Tannenbaum or any other attorney, beyond those that are referenced in the Superseding Indictment, that are at issue in his motion. Thus, the undersigned has limited his consideration to Kowalewski's communications with Michael Tannenbaum (or his firm) that occurred prior to January 2011 concerning the Special Opportunities Fund, as described by Defendant in his November 29, 2010 testimony and in the Superseding Indictment.

[14]   Because the undersigned finds waiver of the attorney-client privilege protecting Kowalewski's communications with Tannenbaum and his firm, the undersigned does not reach the Government's argument that the crime-fraud exception to the privilege applies.

privilege team concludes that the documents are not privileged, the Government will notify defense counsel and the Court and ask the Court to review the documents *in camera* at that time," but if the privilege team "agrees that the documents are privileged, AUSA McClain and Phillips will not seek to review the documents or otherwise make use of them." (*Id.*). Kowalewski has not objected to that procedure or shown why it is inadequate to protect him from disclosure of privileged communications to the prosecution team.

Accordingly, it is further **RECOMMENDED** that Kowalewski's request for a hearing or *in camera* review in connection with his motion to suppress (Doc. 30) be **DENIED**.

## III. <u>Motion For Production Of Grand Jury Transcripts (Doc. 29)</u>

Kowalewski moves the Court, pursuant to FED. R. CRIM. P. 6(e)(3)(E)(ii), to order the Government to produce "certain portions of the grand jury transcripts," in particular those portions that relate to attorney "M.T.," i.e., Michael Tannenbaum, referenced in the indictment. (Doc. 29 at 1-2). Kowalewski asserts that "[t]he indictment refers to a privileged communication between Mr. Kowalewski and attorney M.T.," and that "[i]t appears that in determining whether [Defendant] provided accurate testimony, the government obtained intruded [sic] on [Defendant's] confidential communications with attorney M.T." (*Id.* at 1-2). As discussed above, Count 24 charges that Kowalewski obstructed the SEC

investigation by testifying falsely about Tannenbaum's involvment in making revisions to the Special Opportunities Fund's Private Offering Memorandum to remove an expense cap.  (*See* Doc. 63 at ¶ 18(c)).  Thus, Kowalewski asserts, "it appears that some privileged information was presented to the grand jury to return an indictment."  (Doc. 29 at 2).  Kowalewski further contends that "[i]n order for the Court and [Defendant] to reasonably evaluate this issue, each should be permitted to see the relevant portion of the transcripts."  (*Id.* at 2-3).  He points out that this motion is a companion to his motion to suppress evidence obtained in violation of his attorney-client and work product privilege (*see* Doc. 30).  (*Id.* at 1).

In response, the Government "opposes the motion on the ground that [Defendant] has failed to carry his burden of showing a 'particularized need' for this information," as required to justify the production of grand jury documents.  (Doc. 37 at 1).  The Government argues that Kowalewski's "only argument—that the Government 'must have' intruded on his confidential communications with attorney Tannenbaum—is an unsubstantiated allegation and, thus, does not justify the requested disclosure."  (*Id.* at 3-4).

"[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."  *United States v. Garcia*, 311 Fed. Appx. 314, 316 (11th Cir. 2009) (quoting *Douglas Oil Co. of Cal. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979)).  Federal Rule of Criminal Procedure 6(e) "codifies this

expectation of secrecy except in the limited circumstances provided for in subsection (e)(3)." *Id.* "Fed. R. Crim. P. 6(e)(3)(E)(ii) provides that grand jury transcripts may be disclosed 'at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury.' " *United States v. Jones*, No. 1:05-CR-617-WSD/AJB, 2006 U.S. Dist. LEXIS 101614, at *40 (N.D. Dec. 21, 2006). "However, precedent establishes that the Court should not so disclose unless the party requesting the grand jury transcript establishes that a particularized need exists which outweighs the policy of secrecy." *Id.*

The undersigned finds that Kowalewski has not shown a particularized need for Michael Tannenbaum's grand jury testimony. As discussed above, the undersigned finds that the attorney-client privilege protecting Kowalewski's communications with Tannenbaum concerning the Special Opportunities Fund was waived, either by the receiver on behalf of SJK, or by Kowalewski through his November 2010 testimony before the SEC. Therefore, to the extent that Kowalewski contends that he needs Tannenbaum's grand jury testimony concerning those communications to challenge the admissibility of allegedly privileged communications, his motion is due to be denied. In the absence of any other particularized need for that testimony, Kowalewski's motion to produce portions of the Grand Jury transcripts (Doc. 29) is **DENIED**.

**IV.    Defendant's Motion To Disclose All Communications Between The U.S. Attorney's Office And The SEC (Doc. 34)**

Kowalewski moves "for an order compelling the United States Attorney's Office and the SEC to produce all communications between the two parties related to the investigation of Mr. Kowalewski."    (Doc. 34 at 1).    He sets out the procedural history of the SEC's examination and investigation of Defendant, his sworn testimony on April 16, 2010 and November 29, 2010 during that investigation, the SEC's January 6, 2011 filing of the civil action, and the April 18, 2013 termination of the civil action.    (*Id.* at 3).    Kowalewski notes that "[i]t is not clear when the U.S. Attorney's Office began its criminal investigation into Mr. Kowalewski," but asserts that "[b]ased on the chain of events," including the SEC's March 2011 recommendation of criminal prosecution, the Government's witness interviews in October and November 2012, and Michael Fulcher's entry of a guilty plea on April 18, 2013, "it is clear that the SEC and the U.S. Attorney's Office were conducting parallel investigations in the same time frame."    (*Id.* at 3). Citing *United States v. Kordel*, 397 U.S. 1, 11-12 (1970), Defendant contends that "[t]he government may not use evidence obtained in a civil proceeding in a criminal action when use of that evidence would violate the defendant's constitutional rights or depart from the proper administration of criminal justice." (Doc. 34 at 4).    Kowalewski explains that "[t]he purpose of this Motion is to

41

determine whether those parallel investigations became improperly intertwined." (*Id.* at 3).

In response, the Government contends that Kowalewski's motion should be denied because the criminal discovery rules, including Rule 16, do not require such disclosure. (Doc. 50 at 1). The Government points out that Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963) set out what disclosures the Government must make, but neither is "an evidentiary rule that grants broad discovery powers to a defendant," or entitle Kowalewski in this case to disclosure of the communications between the U.S. Attorney's Office and the SEC. (*Id.* at 2-3(quotation omitted)). The Government points out that Rule 16 "exempts from disclosure any documents made by an attorney or other agent of the government in connection with the investigation or prosecution." (*Id.* at 3 (citing Rule 16(a)(2)). Further, the Government argues, Kowalewski has not shown that the disclosures are required under *Brady* because he "does not explain how any communications would be material to the charges or his guilt in this case"; speculation is insufficient to make that showing. (*Id.*). Critically, the Government contends that Kowalewski has made no showing of misconduct by the Government that could warrant the discovery Kowalewski requests. (*Id.* at 4-7).

Kowalewski has not shown that the Court should compel the disclosures he seeks in this motion. As an initial matter, there is nothing inherently improper

about the Government conducting parallel civil and criminal investigations, or in its agencies cooperating with each other and sharing information about those investigations.  As explained by the Fifth Circuit Court of Appeals:

> There is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions.  Parallel civil and criminal proceedings instituted by different federal agencies are not uncommon occurrences because of the overlapping nature of federal civil and penal laws.  The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled to indicate the different interests promoted by different regulatory provisions even though it attempts to vindicate several interests simultaneously in different forums.

*United States v. Simcho*, 326 Fed. Appx. 791, 792 (5th Cir. 2009) (quotations omitted).  "In fact, with respect to the investigation and prosecution of potential violations of S.E.C. regulations and laws, parallel civil and criminal investigations and prosecutions are not only common, but the sharing of information between agencies is authorized by statute." *United States v. Harris*, No. 1:09-CR-0406-TCB-JFK, 2010 U.S. Dist. LEXIS 126620, at *42 (N.D. Ga. Oct. 22, 2010) (citing *United States v. Stringer, III*, 535 F.3d 929, 933 (9th Cir. 2008) ("Federal securities laws authorize the SEC to transmit evidence it has gathered to the USAO to facilitate a criminal investigation by the USAO.")), *adopted by* 2010 U.S. Dist. LEXIS 126612 (N.D. Ga. Dec. 1, 2010).  "And the U.S. Supreme Court has recognized and approved the use of parallel civil and criminal investigations and

prosecutions as necessary to protect the public interest." *Harris*, 2010 U.S. Dist. LEXIS 126620, at *42-43 (citing *Kordel*, 397 U.S. at 11). "In *Kordel*, the Supreme Court held that, on the record before the court, the defendants did not establish 'either a violation of due process or a departure from proper standards in the administration of justice' by the use of testimony taken in a civil proceeding against the defendant in the subsequent criminal prosecution." *Id.* at 43 (citing *Kordel*, 397 U.S. at 11).

In *Harris*, the court considered whether the defendants' SEC deposition testimony should be suppressed in their criminal case and explained that the "determining principle" for making that decision is: " 'the prosecution may use evidence acquired in a civil action in a subsequent criminal proceeding *unless* the defendant demonstrates that such use would violate his constitutional rights **or depart from the proper administration of criminal justice**.' " *Harris*, 2010 U.S. Dist. LEXIS 126620, at *44 (quoting *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1138 (N.D. Ala. 2005) (internal quotation omitted) (emphasis in original)). Furthermore, "the critical evidence that [a defendant] must establish in order to make the necessary showing of a due process violation, that is, a departure from the proper administration of justice, is either that 'the government made affirmative misrepresentations or conducted a civil investigation solely for the purposes of advancing a criminal case' " *Id.* (quoting *Stringer*, 535 F.3d at 937);

*see also Stringer*, 535 F.3d at 936 ("The Supreme Court has held that the government may conduct parallel civil and criminal investigations without violating the due process clause, so long as it does not act in bad faith.").

Thus, Kowalewski appears to seek all communications between the SEC and the U.S. Attorney's Office to try to make the required showing of bad faith by the Government, but he has not provided or pointed to any record evidence that suggests bad faith or that would justify forcing the Government to make the disclosures. On reply, Kowalewski points to May 2011 e-mail communications, discussed above, between Mr. Bosch, the attorney for the receiver for SJK, and Mr. Todd, Kowalewski's attorney in the SEC case, concerning the SEC's review of SJK's electronic files. (*See* Doc. 81 at 2; *see also* Doc. 54-3). Kowalewski asserts that "Mr. Bosch [gave] Mr. Todd the impression again that only the SEC and his firm would be reviewing the documents," and that there was "nothing in these communications that indicates that SJK's electronic documents are going to be produced to the U.S. Attorney's Office," yet three days later, SJK's electronic documents were produced to the U.S. Attorney's Office "[a]t the request of Stephen McClain." (*See* Doc. 81 at 2-3; Doc. 54-2 at 1). "Thus," Kowalewski contends, "Mr. Todd was misled by Mr. Rue [an attorney for the SEC] and Mr. Bosch about the true purpose of the document review and was never informed of the existence of a criminal investigation." (Doc. 81 at 3). In support of his

45

contention that the Government's actions were "improper," Kowalewski quotes the *Stringer* case—"A government official must not affirmatively mislead the subject of parallel civil and criminal investigations into believing that the investigation is exclusively civil in nature and will not lead to criminal charges." 535 F.3d at 940 (internal quotations omitted). (Doc. 81 at 3). The cited e-mails, do not show that Mr. Bosch, who was merely the attorney for SJK's receiver, or any government official, "affirmatively misled" Kowalewski or his attorney into believing that the SEC's investigation would not lead to criminal charges. While Mr. Bosch did not indicate in the cited e-mails that SJK's documents would be produced to the U.S. Attorney's Office, he did not (a) suggest that he had only produced them to the SEC, (b) state that he was not going to produce them to the U.S. Attorney's Office, or (c) suggest that criminal charges would not be brought. Moreover, the fact that the U.S. Attorney's Office requested SJK's receiver to provide documents to it at the same time SJK's receiver was providing those documents to the SEC does not indicate that the Government acted improperly or in bad faith. *See Harris*, 2010 U.S. Dist. LEXIS 126620, at *42.

Kowalewski cites to the Declaration of his attorney, Mr. Todd, attached to his reply brief, in which Mr. Todd stated that Mr. Rue, the SEC's attorney, told Mr. Todd in May 2011 that "Stan needs to go to jail. Stan is going to jail, and I'm going to do my part to put him there." (*See* Doc. 81-1 at ¶¶ 3-4). Even if true, that

evidence does not show that the SEC mislead Kowalewski or pursued its investigation, leading to the filing of its civil action in January 2011, in order to obtain evidence for a criminal investigation. Even if the SEC believed that Kowalewski violated federal criminal laws and should be prosecuted,[15] he has not pointed to any evidence that the SEC conducted its investigation into Kowalewski's violations of federal securities laws in order to pursue a criminal investigation in cooperation with the U.S. Attorney's Office.

A case cited by Kowalewski, *United States v. Scrushy*, highlights the insufficiency of his showing in support of his motion. In that case, the court suppressed the defendant's SEC deposition testimony because by the point the deposition occurred, the SEC civil investigation was not simply a parallel investigation to the Justice Department's criminal investigation, but had "merged" with the criminal investigation. *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1139-40 (N.D. Ala. 2005). There, the evidence showed that "the Government had both notice and direct input" into the deposition; the SEC's attorney "received explicit directions from the U.S. Attorney's office concerning tailoring his examination of Mr. Scrushy," and was advised how to keep Scrushy "in the dark regarding the criminal investigation"; and location of the deposition was moved

---

[15] Defendant asserted in his motion that he "has information indicating that the SEC was recommending criminal prosecution of Mr. Kowalewski in March 2011." (Doc. 34 at 3).

from Atlanta to Birmingham at the U.S. Attorney's request so that his office could have jurisdiction over any criminal charges related to the testimony.  *Id.* at 1138.

Kowalewski has not pointed to evidence that demonstrates the SEC's civil investigation and the Government's criminal investigation of Kowalewski were so intertwined.  The SEC's civil investigation began in March 2010, during which Defendant was deposed by the SEC, and which culminated in its filing of a complaint in January 2011 in which it pursued civil remedies, including injunctive relief, disgorgement and civil penalties.  Unlike in *Scrushy*, Kowalewski has not pointed to evidence that even suggests the type of direction or involvement by the U.S. Attorney's Office in conducting the SEC's investigation, and in particular in conducting its depositions.[16]  Kowalewski has received information that the SEC recommended criminal prosecution of him in March 2011 and that the Government conducted witness interviews in October and November 2012 (Doc. 34 at 3), well after the SEC began its investigation and after the SEC filed its civil action.  The timing here matters, as the civil investigation came first, it is harder to show that the government initiated the civil investigation to obtain evidence to use in pursuing criminal charges.  *See, e.g..*, *Stringer*, 535 F.3d at 939 (noting that it is significant that SEC began civil investigation first because that "tends to negate any likelihood that the government began the civil investigation in bad faith" to

---

[16] *See, e.g.* Doc. 54-4 (transcript of November 29, 2010 deposition showing that no one from the U.S. Attorney's Office was present).

obtain evidence for criminal prosecution).  Kowalewski has made no showing that during the SEC's civil investigation, including during the 2010 depositions, any criminal investigation was occurring, the U.S. Attorney's Office was improperly involved in the civil investigation, or that any government official mislead him or his counsel into believing that a criminal investigation was not ongoing or would not occur.  Kowalewski's assertions and evidence fall far short of the showing of "deceit or an affirmative misrepresentation justifying the rare sanction of dismissal of criminal charges or suppression of evidence," *Stringer*, 535 F.3d at 933, or to warrant the wholesale disclosure of "all communications between the U.S. Attorney's Office and the SEC."

*United States v. Gangar*, No. 3:07cr00010, 2007 U.S. Dist. LEXIS 84472 (W.D. Va. Nov. 15, 2007), a case cited by the Government (*see* Doc. 50 at 4-6) is instructive.  In that case, the court explained that in other cases on this issue—i.e., *Stringer*, *Scrushy*, and *Thaye*r—"the Court's inquiry into the Government's investigation was occasioned by some threshold evidentiary showing giving rise to a reasonable concern about the intertwinement," such as misleading statements by SEC investigator about the existence of the criminal investigation, or testimony of and SEC accountant that the U.S. Attorney's Office had decided the location of the defendant's deposition.  *Gangar*, 2007 U.S. Dist. LEXIS 84472, at *4-5 (quoting *United States v. Mahaffy*, 446 F. Supp. 2d 115, 127 (E.D. N.Y 2006)).  The court in

*Gangar* found that the defendants had "failed to make a threshold evidentiary showing giving rise to a reasonable concern about intertwinement . . . between the civil and criminal investigations," noting that the defendants had not alleged any facts that indicated that the investigation was improperly conducted, or that "the SEC was acting at the behest of law enforcement or had any interest in the [defendants] outside the civil enforcement action," but instead, made only "conclusory assertions . . . that the SEC was acting as an agent for or at the direction of [the] FBI and other law enforcement authorities during the course of its civil investigation." 2007 U.S. Dist. LEXIS 84472, at *5-6 (internal quotations omitted). The court finds that Kowalewski's similarly conclusory assertions are insufficient to show improper intertwinement between the U.S. Attorney's Office and the SEC such that the Government should be required to disclose "all communications between [the U.S. Attorney's Office and the SEC] related to the investigation of Mr. Kowalewski," and therefore, his motion (Doc. 34) is **DENIED**.

## V.   The Government's Motion For Determination Of Applicability Of Attorney-Client Privilege To Advice From Martha Peddrick (Doc. 32)

The Government moves for a determination that Kowalewski's communications with Martha Peddrick, a North Carolina estate planning attorney who "provided estate planning services to [Defendant] and his wife in 1999 and 2010" (*see* Doc. 40-2), "are not covered by the attorney-client privilege so that the

government may interview Peddrick and call her to testify at trial if appropriate." (Doc. 32 at 7). The Government asserts that during Kowalewski's November 2010 testimony before the SEC, he "testified about the content of legal advice that he says Peddrick gave to him" concerning the Special Opportunities Fund's purchase of his personal homes and re-purchase by Defendant of those homes. (Doc. 32 at 5-6; *see also* Tr. at 51-52, 55-56, 62-64). The Government "believes Kowalewski's testimony to be false, and yet another attempt to obstruct the SEC proceeding," consistent with other alleged misrepresentations by Kowalewski "that other individuals had blessed his valuations or self-dealing transactions when in fact they had not." (Doc. 32 at 6). The Government speculates that if Ms. Peddrick "is like the others, [she] is another professional whose name Kowalewski used in sworn testimony to throw off the SEC, and make it appear that his actions were legitimate." (*Id.* at 7).

In support of its argument that Kowalewski's communications with Peddrick "as described and disclosed by" Kowalewski in his November 2010 testimony are not protected by attorney-client privilege, the Government contends, similar to its arguments with respect to Tannenbaum above, that Kowalewski waived the privilege by testifying about those communications, and the crime-fraud exception to the privilege applies. (*Id.*). Kowalewski "objects to any disclosure of his communications by Ms. Peddrick," and asks the Court to "find that the attorney-

client privilege protects [his] communications with Ms. Peddrick." (Doc. 40 at 4). For the reasons discussed below, the undersigned finds that Kowalewski waived his attorney-client privilege as to his communications with Ms. Peddrick to which he testified on November 29, 2010.[17]

A.   **Defendant Disclosed The Substance Of His Communications With Peddrick**

Kowalewski contends that he did not waive the attorney-client privilege during his November 2010 testimony because "a review of Mr. Kowalewski's testimony indicates that he did not disclose the substance of his communications. To the contrary, he only provided enough detail so that the SEC examiners knew that he was asserting a valid attorney-client relationship." (Doc. 40 at 5). Kowalewski asserts that he only "revealed the subjects he consulted Ms. Peddrick on and the timing of the consultations," and "that he received advice from Ms. Peddrick and took action after receiving it, but he did not disclose the substance of their communications." (*Id.* at 6, 8).

The Government argues that Kowalewski's assertion that he "did not disclose the substance of his communications" with Peddrick during this testimony

_____

[17] The undersigned does not reach the Government's alternative contention that the crime-fraud exception applies.

"simply ignores the portions of the transcript where he clearly disclosed the substance of what she allegedly told him," including the following testimony[18]:

- "[I]nitially, my estate planning attorney [Peddrick] told me that I should have my homes held under an LP." (Tr. at 51)

- "[T]hen six months later she tells me I shouldn't because the estate tax laws are about to be put back into place, there are issues with what the Obama administration is doing. Now it's better to have it, unless it's a second home, a truly second home, it would be better to be held in your name . . . ." (*Id.*).

- "Q: Who was it that advised you to put your homes in an LP?

  A: Martha Peddrick." (*Id.*).

- "Q: So at that time your lawyer Ms. Peddrick is still advising you to put all your property in a limited partnership? A: Yes." (*Id.* at 62).

- "Q: So it's not just your own house you live in, she is advising you to put all property you own in a limited partnership arrangement?

  A: Correct." (*Id.*).

---

[18] Kowalewski testified about Peddrick's advice in response to the SEC's questions concerning the reasons the Special Opportunities Fund purchased homes from him and then sold them back to him. (*See* Tr. 47-52, 62).

- "Q: And when did she tell you that your home should be in a limited partnership? A: beginning of this year, end of – I'd say end of last year." (*Id.* at 51).

- "Q: And when did she change her advice and tell you that it shouldn't be in an LP? A: About a year later, so just about 60 to 90 days ago." (*Id.*).

(Doc. 48 at 2-3; *see also* Tr. 51, 62).

The undersigned agrees with the Government that Kowalewski testified about the substance of his communications with Peddrick about the reasons he sold real property to the Special Opportunities Fund (by placing the property in an LP), and then re-purchased that property. He did not limit his testimony to simply stating that he spoke with Ms. Peddrick, or that he took certain actions after speaking with her, while remaining silent on what she actually told him. Instead, he testified about what advice she allegedly gave him and why she gave him that advice. (*See* Tr. 51, 62). "By revealing the substance of the communication, [Defendant] has gone beyond the who, what, and where type of testimony necessary to set up the privilege, and has instead revealed the contents of the privileged material." *Mohawk Indus. v. Interface, Inc.*, No. 4:07-CV-0212-HLM, 2008 U.S. Dist. LEXIS 104317, at *33 (N.D. Ga. Sept. 29, 2008).

### B. Defendant's Disclosures Were Not Inadvertent

Kowalewski further argues that even if he revealed privileged communications, "such a disclosure should not result in a waiver because it was not intentional." (Doc. 40 at 9-10). Citing Federal Rule of Evidence 502, he contends that his disclosures were inadvertent, and thus, "did not operate as a waiver of his attorney-client privilege[.]" (*Id.* at 10-13). He points out that his attorney stated he did not intend to waive the privilege and instructed Kowalewski not to answer two questions related to advice Ms. Peddrick provided, and Kowalewski did not answer those questions. (*Id.* at 10; *see also* Tr. 62-63). He asserts that "[b]y not answering these questions, Mr. Kowalewski clearly indicated a desire not to rely on the advice of Ms. Peddrick." (*Id.*). The undersigned disagrees.

Rule 502(b) provides:

When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error. . . .

FED. R. EVID. 502(b). The undersigned finds that Kowalewski's disclosures concerning his communications with Peddrick described above were not inadvertent; "[h]e purposefully testified about what [Peddrick] had told him." *Plache*, 913 F.2d at 1380. Kowalewski cites *Datel Holdings LTD v. Microsoft Corp.*, No. C-09-05535 EDL, 2011 U.S. Dist. LEXIS 30872 (N.D. Cal. Mar. 11,

2011), in support of his contention that his disclosures were unintentional (Doc. 40 at 12-13), but that case is easily distinguishable. That case involved the unintended production of privileged documents resulting from a "computer glitch," *Datel*, 2011 U.S. Dist. LEXIS 30872, at *7-10, not testimonial disclosures. *See Plache*, 913 F.2d at 1380 n.2 ("The inadvertence cases cited by Plache are distinguishable in that they involved the inadvertent exchange of documents or tapes and not testimonial disclosures, as here.").

Defense counsel's assertion of the privilege as to some questions does not affect the analysis. After Kowalewski testified repeatedly concerning Peddrick's advice (*see* Tr. 51, 62), Kowalewski's attorney and the SEC's counsel engaged in a discussion about whether he intended to waive his attorney-client privilege (Tr. 62-6). The SEC's counsel stated that it was not his intention "to impermissibly invade the attorney-client privilege," and Kowalewski's counsel stated, "I don't want to get into a situation where we are waiving the privilege." (*Id.*). Kowalewski's counsel then instructed his client not to answer the next two questions on the ground of attorney-client privilege. (Tr. 63). Kowalewski's assertions of his attorney-client privilege do not protect his previously disclosed communications with Peddrick, however. *See, e.g.*, *Adler*, 202 F.R.D. at 674-75 (finding that client had previously waived his privilege by testifying about attorney-client communications and could not later assert the privilege as to those

communications); *Mohawk*, 2008 U.S. Dist. LEXIS 104317, at *31-33 (finding that the defendant had waived attorney-client privilege as to certain communications by testifying about them at deposition, even though counsel had objected to questions about other communications). Nor does the SEC attorney's statement that he did not intend to "impermissibly invade" that privilege undermine the finding that Kowalewski had already waived his privilege by disclosing the substance of his communications with Peddrick. *See, e.g.*, *Plache*, 913 F.2d at 1380 (government counsel's statement to the defendant that he did not "want to get into an attorney-client privilege" did not affect the waiver analysis because the defendant had already waived the privilege by disclosing attorney-client communications during his grand jury testimony, and the attorney's comment "had nothing to do with the intial waiver")

The undersigned finds that Kowalewski waived his attorney-client privilege as to his communications with Peddrick concerning the reasons he sold personal real property to the Special Opportunities Fund and then re-purchased that property, by testifying about the content of those communications on November 29, 2010. Accordingly, it is **RECOMMENDED** that the Government's motion be **GRANTED**, to the extent that the Government "seeks a determination that Kowalewski's communications with Peddrick, as described and disclosed by Kowalewski in his sworn testimony [of November 29, 2010], are not covered by

the attorney-client privilege so that the government may interview Peddrick and call her to testify at trial if appropriate." (Doc. 32 at 7).

### Summary

Defendant's Motion to Produce Grand Jury Transcripts (Doc. 29) and Motion to Disclose All Communications Between the U.S. Attorney's Office and the SEC (Doc. 34) are **DENIED**.

It is **RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained in Violation of Defendant's Attorney-Client and Work Product Privileges (Doc. 30) be **DENIED**, and that Defendant's Motion to Suppress Statements (Doc. 31) be **GRANTED**. It is further **RECOMMENDED** that the Government's Motion for Determination of Applicability of Attorney-Client Privilege to Advice Allegedly Rendered By Martha Peddrick (Doc. 32) be **GRANTED**.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 7th day of October, 2014.


 /s/  J. CLAY FULLER
J. CLAY FULLER
United States Magistrate Judge